**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **THE DOGWOOD INSTITUTE,** | § | |
| **TRUSTEE OF THE DOGWOOD TRUST,** | § | |
| **individually and on behalf of classes** | § | |
| **similarly situated, and** | § | |
| **ROBERT J. FULLER,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION** |
| | § | **NO. 3-06CV1454-K** |
| **A. G. EDWARDS & SONS, INC., EATON** | § | **ECF** |
| **VANCE GROUP OF FUNDS, PHOENIX** | § | |
| **INVESTMENT PARTNERS, LTD., VAN** | § | |
| **KAMPEN INVESTOR SERVICES, INC.,** | § | |
| **CARLA ULRICHHERRING, DENNIS** | § | |
| **CAPRIGLIONE, JAMES WOODROW** | § | |
| **FULLER, JR., individually and as Trustee** | § | |
| **of the Red River Trust, and MELISSA** | § | |
| **FULLER** | § | |
| | § | |
| **Defendants.** | § | **JURY DEMANDED** |

## PLAINTIFF'S FIRST AMENDED COMPLAINT [PETITION] - CLASS ACTION

Plaintiffs, The Dogwood Institute ("Institute"), in its capacity as trustee of the

Dogwood Trust ("the Trust"), and Robert J. Fuller ("Bob"), subject to and without

waiving their motion to remand this action, file this first amended complaint [which will

be re-styled after remand as plaintiffs' first amended petition] against Defendants, A. G.

Edwards & Sons, Inc. ("Edwards"), Eaton Vance Group of Funds ("Eaton"), Phoenix

Investment Partners, Ltd. ("Phoenix"), Van Kampen Investor Services, Inc. ("Kampen"),

Carla Ulrichherring ("Carla"), Dennis Capriglione ("Dennis"), James Woodrow Fuller,

Jr., individually and as trustee of the Red River Trust ("Jim"), and Melissa Fuller

("Melissa"), and in support thereof would respectfully show this Honorable Court as

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                    **Page 1**

follows:

1.   None of the defendants has yet filed an answer to plaintiffs' original petition. Therefore, this amended complaint is filed "as a matter of course" as permitted by F.R.C.P. 15(a).

## PARTIES, JURISDICTION AND VENUE

2.   Plaintiff Institute is a Texas non-profit corporation with its only place of business located in Dallas County, Texas.   Institute is currently the sole trustee of the Trust, which is a Texas trust established by Bob as grantor under a trust agreement dated March 5, 1997.   A true copy of the trust agreement was attached to plaintiffs' original petition as Exhibit A.   Defendants Edwards, Eaton, Phoenix and Kampen hold and have held for several years the assets of the Trust in a fiduciary capacity with respect to the Trust.   Institute brings this suit both on the individual claims of the Trust and on behalf of certain classes of persons and entities whose assets are held by these defendants, as more fully explained hereinafter.

3.   Plaintiff Bob is an individual who resides in Dallas County, Texas.   Bob is the assignee of all rights and claims of a majority of the beneficiaries of the Trust, and as assignee asserts those claims and rights in this action.

4.   All defendants have appeared by their respective counsel in this action and thus no service, other than service of this pleading on counsel of record, is required.

5.   Defendant Edwards is a Delaware corporation which maintains a place of business in Dallas County, Texas.

6.   Defendant Carla is an individual who resides in Dallas County, Texas.

7.   Defendant Eaton is a non-Texas corporation that does business in Texas.

**PLAINTIFF'S FIRST AMENDED COMPLAINT** Page 2

8.  Defendant Phoenix is a non-Texas corporation that does business in Texas.

9.  Defendant Van Kampen is a Delaware corporation that does business in Texas.

10.  Defendant Dennis is an individual who is an attorney employed by Edwards in St. Louis, MO, who has taken certain illegal actions directed to a former trustee of the Trust in Dallas County, Texas, joined in a civil conspiracy to convert the assets of the Trust, and to promote Jim's false claim to the trusteeship of the Trust, and thereby subjected himself to the jurisdiction of this Court.

11.  Defendant Jim is an individual who resides in Richmond Virginia, who has taken certain illegal actions directed to Dallas County, Texas and thereby subjected himself to the jurisdiction of this Court, and who is sued herein both in his individual capacity and as trustee of the Red River Trust.

12.  Defendant Melissa is an individual who resides in Richmond Virginia, who is a beneficiary of both the Trust and the Red River Trust and thus has certain interests that will be affected by the outcome of these proceedings.

11.  This Court has jurisdiction over the parties and claims set forth in this petition. Most of the events giving rise to this petition occurred in Dallas County.  Venue of this action is proper in Dallas County, Texas.

## FACTUAL BACKGROUND

Historically Relevant Facts.

12.  Prior to the events at issue, Carla and Bob were personal friends. When Bob established and funded the Trust in 1997, he brought its investment business to Carla because of their friendship and his trust in her.  Carla was solely responsible for making recommendations for the Trust's investments and for interfacing with Bob and the

trustees.  Unbeknownst to Bob and the trustees, Carla recommended investments for the Trust that maximized the commission and fee income for Carla and Edwards, including fees periodically paid to them by defendants Eaton, Phoenix and Kampen (collectively the "institutional defendants"), but which were unsuitable for the Trust.

13.   Prior to the events at issue, Jim and Bob had been extremely close, even for brothers, for thirty years.  Bob trusted Jim completely and, as a result of that trust and to avoid any argument by Bob's potential creditors that the Trust's assets could be reached for Bob's potential debts, Bob gave Jim the power to remove and appoint trustees, and subsequently made Jim the trustee. Jim agreed to follow Bob's instructions and gave Bob a power of attorney and a number of signed, blank trading authorizations for the Trust's account at Edwards so that Bob could directly control the Trust's investments.  Bob explained all of this to Carla.

14.   On information and belief, a conspiracy between Carla and Jim began in the summer of 1999.  For reasons unrelated to the Trust, Jim became very angry at Bob and decided to wrest control of the Trust from Bob.  At a time when Jim and Carla knew that Bob was incommunicado on a camping trip in the Idaho wilderness, they transferred all of the Trust's assets from Edwards in Dallas to a small Richmond brokerage firm and attempted to conceal that transfer from Bob after his return to civilization.  Eventually, Bob confronted Carla about the non-receipt of Trust account statements and Carla confessed to what she and Jim had done.  Bob and Jim exchanged angry faxes and emails for two years, but did not otherwise communicate with each other.

15.   In 2001, under threat of being sued by Bob, Jim sent part of the Trust's assets back to Carla at Edwards in Dallas, resigned as trustee, and assigned to Bob all of Jim's

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                             **Page 4**

rights and powers under the Trust.  Although Bob does not know the exact amount of the Trust assets that Jim and Carla transferred to the Richmond broker in 1999, because Bob had not been receiving account statements from Edwards for some time prior to the transfer and did not receive account statements from the Richmond broker, Bob recalls that the value of the assets at that time was approximately $300,000.  When Jim transferred part of the Trust's assets back to Edwards in 2001, the value of the assets transferred was approximately $125,000.  Jim kept $75,000, which he put into a new trust that he formed in Virginia, of which Jim was the trustee and Jim and his daughter Melissa were the sole beneficiaries.  Nothing in the Trust agreement authorized Jim to do that.  What happened to the other $100,000 is not clear but will be explored during discovery.  It may have been expropriated by Jim or simply squandered by his mismanagement of the Trust's investments.

16.  Bob appointed Lileth Company ("Lileth"), a Texas corporation owned by the Trust and of which Bob was the sole officer and director, as the new trustee.  Bob informed Carla of Jim's resignation and assignment and of Bob's appointment of Lileth as the new trustee, and Bob sent copies of the documents effecting the resignation, assignment and new appointment to Carla.  Carla, however, refused to change Edwards' account records for the Trust unless she received a "blue ink" original of Jim's resignation and assignment, despite the fact that the document stated that a facsimile thereof should be treated as an original for all purposes.

17.  Subsequent events have made it clear that Carla's insistence on a "blue ink" original of Jim's resignation and assignment was part of her conspiracy with Jim to keep Bob from exercising control over any part of the Trust's assets.  Bob thought at the time

that Jim had mailed a "blue ink" original of the document to Bob, in addition to faxing it to Bob, and Bob agreed to look for it.   Bob also told Carla that if she really needed the "blue ink" original she should ask Jim for it, since they were communicating with each other whereas all communication between Bob and Jim had ceased.

18.   For five years, Carla knew (a) that Jim had resigned as trustee and had assigned to Bob the power to appoint and remove trustees, (b) that Bob had appointed Lileth as the new trustee, (c) that Bob and Jim had ceased all communication, and (d) that all she had to do to obtain the "blue ink" document that she supposedly wanted [but did not really need] was to pick up the phone and call Jim [or write Jim or email Jim requesting that document]. Yet Carla, in furtherance of her conspiracy with Jim, carefully maintained her pretended ignorance as to the change of the trustee.

19.   Meanwhile, Carla and Edwards continued to receive income from the Trust's investments, Jim retained possession of that portion of the Trust's assets that he had not returned to Edwards, and the true trustee, Lileth, had no means of managing the Trust's remaining investments or of paying the federal income tax on the meager income that the Trust earned on its investments.   Deeply saddened by the betrayal by his brother and by his friend, but understandably reluctant to sue them, and having been told by Jim in no uncertain terms that Bob was not to initiate any further communications with Jim, Bob crawled into an emotional shell, tried to heal and waited for Jim and Carla to resolve this bizarre stalemate.

**Operative Facts.**

20.   Some of the historical facts recited above are also operative facts with respect to the causes of action against Jim, Carla and Edwards.   These facts include: (a) in 1999

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                        **Page 6**

Jim began conspiring with Carla to prevent Bob from exercising any control over the Trust's investments and to conceal their machinations from Bob; (b) as a result of acts committed pursuant to that conspiracy, the Trust was deprived of the possession of about $175,000 of its assets due to Jim's mismanagement and expropriations of the Trust's assets, in addition to the lost income that the Trust would have earned had its investments been properly managed; (c) Carla knew that Jim resigned as trustee and assigned to Bob all powers and rights under the Trust in 2001, but Carla pretended ignorance of those facts and, in furtherance of her conspiracy with Jim, demanded a "blue ink" original of a document that she did not really need, that she knew that Bob could not provide, and that she could have easily obtained from Jim; (d) Carla's demand for that document and her refusal to update Edwards' records to reflect the identity of the new trustee was a purposeful act intended to freeze the Trust's investments so that she and Edwards could continue to receive income on those investments; and (e) Carla's and Jim's actions, in furtherance of their conspiracy, prevented Bob from effectively managing the Trust's investments, resulting in lost income for the Trust, and prevented the trustee [Lileth] from paying federal income taxes on the Trust's income, which resulted in damages to the Trust in the form of IRS penalties and interest.

21.  In March 2006, Bob finally broke the silence between the brothers by sending Jim a letter requesting that Jim supply to Carla the "blue ink" original of Jim's 2001 resignation and assignment of rights and powers.  That letter was occasioned by Bob's mounting concern that the stock market was about to enter a major downturn and thus that the Trust's remaining investments would lose significant value, in addition to his concern over the Trust's ever increasing liability for federal income taxes, penalties and interest.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **Page 7**

Jim received that letter, but instead of replying to or complying with it, he telephoned Carla.

22.   Despite repeated requests by Bob, Carla has refused to disclose the contents of her telephone conversation with Jim in late March or early April 2006.  Carla's subsequent actions, however, demonstrate that she and Jim renewed their conspiracy to convert the assets of the Trust and to prevent the true trustee from regaining control over those assets. On April 5, 2006, Carla sent a letter to Bob in which she raised for the first time the question of whether Lileth could serve as the trustee because it was, according to Carla, "a form of the Grantor," and she emphasized that the Patriot Act required Edwards to verify the identity of the persons with whom it transacted business.  These excuses were a mere sham and ruse intended to forestall Bob [as president of the trustee, Lileth] from closing the Trust's account at Edwards.  As Bob pointed out in his responding letter, (1) the Trust Agreement did not prevent a corporation controlled by Bob from serving as trustee; (2) the Trust [not Bob] owned the stock of Lileth; (3) Carla knew full well who Lileth Company was because Carla had handled its investment account for seven years; and (4) Carla knew that Jim had resigned as trustee in 2001 and had assigned to Bob the right to appoint and remove trustees.  There ensued an exchange of emails between Carla and Bob in which Bob demanded that she take the steps necessary to correct the Edwards account records for the Trust, and threatened suit if she did not do so promptly, and Carla insisted that "Jim is the trustee on the account" and that she would do whatever Jim wanted her to do.

23.   To moot Carla's sham arguments, Bob appointed an individual, Jan Kamei ("Jan"), as trustee on April 11, 2006.  That same day Jan sent a certified letter to Carla enclosing documentation of her appointment and demanding delivery of the Trust's assets.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **Page 8**

Carla never gave Jan even the courtesy of a response to that letter, and refused to deliver the Trust's assets to its trustee. Instead, Carla contacted the institutional defendants, where the majority of the Trust's assets were invested, and requested that their account statements be sent to Jim's address in Richmond VA instead of to Jan and Bob's address in Garland TX. Carla took those affirmative actions in furtherance of her conspiracy with Jim to convert the Trust's assets, in intentional derogation of the trustee's legal right to possession of those assets, knowing that her actions would deprive the true trustee of essential information regarding the performance of the investments, and with the intention of helping Jim promote a false claim to the trusteeship. Each of those affirmative acts by Carla constituted conversion and intentional participation in a civil conspiracy to commit conversion.

24. Jan and plaintiff Institute, who replaced Jan as trustee on June 6, 2006, both made repeated demands directly to each of the institutional defendants for delivery of the Trust's assets, to no avail. Those demand letters included the Medallion Signature Guarantees, verifications, and other documents and information requested by the institutional defendants. Each financial institution that provided the Medallion guarantees insisted on examining the trust agreement and the documentation of the succession of trustees, including Jim's resignation and assignment of rights and powers. When Jan supplied the documents initially requested by the institutional defendants, they refused to deliver the assets and demanded more documents. When those additional documents were provided, including copies of Jim's 2001 resignation and assignment of rights and powers, still more documents were demanded and so forth for several rounds of correspondence. The demands made by the institutional defendants were not uniform, consistent or

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                      **Page 9**

reasonable.   One of the institutional defendants [Eaton Vance] ultimately insisted on receiving a Medallion Signature Guarantee by Jim regarding his 2001 resignation and assignment, despite the fact that Bob had previously explained to each of the institutional defendants that Jim was unwilling to provide any documentation.   At the time this lawsuit was filed, none of the defendants had delivered any of the Trust's assets to the trustee. Each of the institutional defendants knowingly entered into the previously described conspiracy to convert the assets of the Trust and to promote Jim's false claim to the trusteeship, actively participated in that conspiracy and benefitted from it.

24.   Carla was shown as being copied on several of the institutional defendants' letters refusing delivery of the assets and demanding further, unnecessary documentation, and it is likely that Carla received blind copies and/or phone calls with respect to the other correspondence from these defendants.   Although plaintiffs have not yet had an opportunity to conduct discovery regarding the contents of the communications between Carla, Jim and the institutional defendants, it can be reasonably inferred that Carla was urging the institutional defendants to keep the Trust's investments unchanged so that she could continue to receive her kickbacks, and the institutional defendants could continue to receive their fees, from those investments.   In the meantime, the market value of the Trust's investments plummeted, just as Bob had predicted.   Finally, after more than ten weeks of trying to gain possession of the Trust's assets for the trustee, Bob obtained assignments of the beneficiaries' [except for Jim and his daughter Melissa] claims and filed this lawsuit.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **Page 10**

25.   The beneficiaries of the Trust are:  Jim, Melissa, Bob's mother, Bob's sister and her husband, and Bob's stepdaughter.   All of the beneficiaries except for Jim and Melissa have assigned all of their rights and claims as beneficiaries of the Trust to Bob, who asserts those claims in this lawsuit [except for the claims of Bob's sister, which have been assigned to Bob but are not asserted herein in deference to her wish not to give the appearance of taking sides in the dispute between her brothers].   Accordingly, all parties who have an interest in the Trust are before this Court.   To the best of plaintiffs' knowledge, as a proximate result of the defendants' acts pursuant to their conspiracy described above, no distributions have been made to any of the beneficiaries since 1999. None of the beneficiaries who assigned their claims to Bob in 2006 had any knowledge or notice of Jim's actions in breach of his fiduciary duties to the Trust as described above. Therefore, the discovery rule prevents limitations from running on those claims prior to the assignment.

26.   The following persons and entities have been trustee of the Trust during the dates indicated:  (1) Michael Ginsburg [Bob's attorney who helped Bob draft and establish the trust] inception to 10/21/98, (2) Jim 10/21/98 to 6/25/01, (3) Lilith Company [a now defunct Texas corporation of which Bob was the sole officer and director] 6/25/01 to 4/11/06, (4) Jan M. Kamei [an individual who resides in Garland TX] 4/11/06 to 6/01/06, and (5) the Dogwood Institute 6/02/06 to present.

27.   At this time, and without waiving the right to amend this complaint [petition] to assert any claims that may be revealed through discovery, no claims for money damages are asserted herein against Melissa.  Melissa has been joined as a defendant because she has an interest in the property owned by the Trust in Texas, in addition to her interest in the

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **Page 11**

assets of the Trust that are currently held by the Red River Trust and/or by Melissa's father Jim, and the declaratory and injunctive relief requested herein will affect her rights as a beneficiary of both the Trust and the Red River Trust.

28.   Prior to the establishment of the Trust, and again prior to his appointment as trustee of the Trust, Jim entered into a binding oral agreement with Bob in which Jim promised to faithfully follow Bob's instructions with respect to the investments and distributions of the Trust's assets.   Jim made these contractual promises in recognition of the facts that Bob had funded the Trust from his personal funds, that Bob understood investments, and that Jim had little or no knowledge or experience with respect to investments.   Jim also promised Bob that Jim would repay to the Trust any distributions made to Jim as soon as Jim was financially able to do so, and that, in the event that Bob needed some or all of the funds that Bob had used to establish the Trust, Jim would distribute the funds to himself and then give them to Bob.   Bob reasonably relied on these promises in establishing the Trust and then again in asking the original trustee, Michael Ginsberg, to resign and appoint Jim as trustee of the Trust.   Due to their closeness [at that time] as brothers and the trust and confidence that Bob felt with respect to Jim and his promises, the relationship between Jim and Bob was a fiduciary relationship in fact and in law such that Jim owed fiduciary duties to Bob.   As discussed below, Jim's actions in 2006 intentionally and maliciously violated those fiduciary duties.

29.   Jim is a practicing PhD psychotherapist and from time to time has purported to give Bob advice and counseling with respect to Bob's psychological condition.   Jim's attempts to diagnose and counsel Bob have been neither invited nor appreciated by Bob, who believes that Jim lacks the objectivity [and perhaps the competence] to diagnose or

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                **Page 12**

treat Bob.  Bob has expressly and repeatedly instructed Jim to stop trying to act as Bob's therapist and to maintain absolute confidentiality as to all third parties with regard to Jim's purported diagnoses of Bob.  Bob's alleged psychological condition is not relevant to any conceivable claim or defense in this lawsuit.  Bob's rights with respect to the therapist/patient privilege are asserted here and nothing in this complaint [petition] or otherwise is intended to waive, in whole or in part, Bob's right to maintain that privilege.  However, on information and belief, Jim has repeatedly violated that privilege by disclosing to persons other than Bob Jim's purported diagnoses of Bob.

30.  The claims against Edwards, Carla, Eaton, Phoenix and Kampen arise out of a common core of corporate greed and subterfuge.  These financial institutions make most of their money on "float" [using their clients' money to make income for themselves], fees charged to manage their clients' investments, and commissions.  They have developed written and unwritten corporate policies and practices that maximize their income from these sources, often to the detriment of their clients to whom they owe fiduciary and contractual duties.  One of the ways that these institutions increase their income is by making unnecessary and unreasonable demands for additional documentation before they will act on properly documented and transmitted instructions from their clients to make necessary changes in their account records and deliver their assets.  These demands serve no useful business purpose other than the unspoken but dominant purpose of delaying the release of their clients' monies so that these institutions can make more float, fee and commission income.  Meanwhile, their clients are deprived of the use of their funds, which frequently results in consequential damages of varying types and amounts.  For the most part, their clients suffer these deprivations in silence or ineffectual grumbling without

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **Page 13**

realizing that they have a remedy at law and that this conduct constitutes breaches of fiduciary duties, breaches of contracts, and conversion of the clients' funds.

31.    Carla and Dennis are employees of Edwards and at all relevant times were acting within the scope of that employment.  Accordingly, Edwards is fully liable for the actions and omissions of Carla and Dennis under the doctrine of *respondeat superior*.

32.    On or before May 23, 2006, Dennis knowingly joined in the conspiracy described above and committed the following affirmative act in furtherance of that conspiracy for the purpose of perpetuating the conversion of the Trust's assets and promoting Jim's false claim to the trusteeship.  Dennis ignored and refused to comply with Bob's request and instruction to Edwards not to communicate directly with the former trustee of the Trust, Jan Kamei, and instead to direct all such communication to Bob as Jan's attorney.  Attached as Exhibit E to plaintiffs' original petition is a letter sent by Dennis directly to Jan [without even a courtesy copy to her attorney Bob] in Dallas County, Texas on May 23, 2006, in flagrant violation of the Texas and Missouri rules governing the ethical conduct of attorneys.  Dennis' letter is a blatant attempt to obtain pre-lawsuit discovery directly from a represented party by circumventing her attorney and is - on its face - outrageous.  Dennis' letter is also an affirmative act intended and designed to promote Jim's false claim to the trusteeship and to perpetuate the conversion of the Trust's assets.  The letter was directed to Jan in her capacity as trustee of the Trust, and the claims arising therefrom are properly asserted here by her successor, Institute.  Bob requests that this Court hold a hearing to determine appropriate sanctions against Dennis and Edwards for this unethical conduct, and that the jury in this matter be informed at the outset of the trial that such conduct occurred and is unethical. Moreover, as part of the injunctive relief

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                          **Page 14**

requested below, plaintiffs ask this Court to put a stop to the unethical conduct by Dennis, which is otherwise likely to continue.

## INDIVIDUAL CLAIMS

### COUNT I - DECLARATORY RELIEF

33.    Pursuant to the Texas Declaratory Judgment Act, plaintiffs ask for a declaratory judgment that includes the following pronouncements, and for their reasonable attorney fees and expenses incurred in securing the following declarations:

a.  That Institute is the sole current trustee of the Trust.

b.  That Institute is entitled to sole possession of all assets of the Trust.

c.  That Jim's actions in removing the Trust's assets to the Red River Trust were wrongful and a breach of his fiduciary duties to the Trust, and that all such assets, and all proceeds thereof, have remained at all times the property of the Trust.

d.    That each of the defendants' demands for additional documentation was unreasonable and unnecessary.

### COUNT II – INJUNCTIVE RELIEF

34.    As described above, defendants have acted, and by all appearances are determined to continue to act, in ways that have caused and continue to cause irreparable harm to plaintiffs for which plaintiffs lack an adequate remedy at law.  The irreparable harm which plaintiffs have suffered and, absent injunctive relief will continue to suffer, includes the deprivation of possession and control of the Trust's assets, and the loss of investment income which could have been obtained, and which could be obtained in the future, if the trustee was not prevented from effectively managing the Trust's investments, and which is not susceptible to the precise quantification required to recover money

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                    **Page 15**

damages.  For example, plaintiffs believe that the assets of the Trust would be much greater than the value of the Trust's present assets if the Trust's investments had been intelligently managed, but plaintiffs will never be able to quantify that lost investment income sufficiently to recover all of that lost income as damages in this lawsuit.  The same is true for future potential investment income for the Trust as long as the trustee is prevented from managing the Trust's investments.  With respect to defendant Jim, the violations of privilege described above have caused and will continue to cause personal pain, suffering and humiliation than can never be compensated by an award of money damages.. With respect to defendant Dennis, who seems to have no regard or respect for the most basic principles of legal ethics, the harm resulting from his unauthorized contacts with represented parties is irreparable as a matter of law.  To avoid the imminent danger of suffering more irreparable harm, plaintiffs seek temporary and permanent injunctive relief as follows:

a.  Prohibiting Jim from pretending to be the trustee of the Trust or the holder of any rights or powers under the Trust, and from otherwise interfering with the contractual relationships of the Trust or with the assets of the Trust.

b.  Requiring Edwards, Eaton, Phoenix, and Kampen to immediately liquidate all assets of the Trust and deliver the proceeds to Institute.

c.  Prohibiting Dennis from directly contacting persons whom he knows to be represented by counsel with respect to the subject of the contact and from otherwise violating the ethical rules governing attorneys.

d.  Requiring Jim to marshal all assets of the Trust and all proceeds thereof in his possession or control, including but not limited to all assets which were transferred to the

Red River Trust in 2001, and to immediately deliver all such assets and proceeds to Institute.

e.  Requiring all defendants to change their records to reflect the fact that Institute is the sole trustee of the Trust and that Bob has the sole power to remove and appoint trustees of the Trust.

f.  Prohibiting Jim from purporting to act as Bob's therapist, from discussing with anyone [including his attorneys] Jim's alleged views of Bob's past or present psychological condition, and from violating the therapist/patient privilege with respect to any of Jim's patients.

COUNT III - CIVIL CONSPIRACY

35.  Each of the defendants has conspired with the other defendants to accomplish illegal, improper and immoral purposes through illegal, improper and immoral means.  The objects to be accomplished by this conspiracy have included (1) expropriation of the Trust's assets, (2) freezing of the Trust's investments, (3) preventing the rightful trustees from obtaining possession of the Trust's assets and from receiving account statements regarding the Trust's investments, and (4) helping Jim to breach his agreements with Bob and to pretend to be the trustee when he had no right to be.  The meeting of the minds of the conspirators can be inferred from their coordinated actions and will be further developed through discovery regarding their communications with each other.  The facts described above include several overt acts by defendants that were unlawful in that they breached or abetted the breach of Jim's fiduciary duties to the Trust and to Bob and prevented the rightful trustees from obtaining possession of the Trust's assets and from effectively managing its investments.  Upon information and belief, each defendant acted

with malice and selfish greed in pursuing the objects of their conspiracy. The Trust suffered damages as a proximate result of those acts in that (1) it was deprived of the possession of its assets, (2) the value of those assets was reduced both by Jim's expropriations and mismanagement and by the predicted diminution in the market value of those assets in 2006, and (3) the Trust has incurred federal income tax liabilities, including penalties and interest, because the trustees were deprived of the means to pay taxes for the Trust. Bob [both directly and in his capacity as assignee of the claims of beneficiaries of the Trust] has also been damaged as a proximate result of acts committed pursuant to that conspiracy. Each of the defendants [except for Melissa] is jointly and severally liable to Institute and Bob for all such damages, regardless of the extent of the participation of that defendant in the conspiracy. Punitive damages should be imposed against each defendant for their intentional and malicious acts committed in furtherance of this civil conspiracy.

### COUNT IV – CONVERSION

36. Edwards, Eaton, Phoenix, Kampen, and Jim have each converted assets of the Trust. Numerous demands by plaintiffs and by Institute's predecessor Jan for possession of the Trust's assets have been made but refused by defendants. On behalf of the Trust, Institute is entitled to recover from these defendants the value of the converted assets, together with punitive damages for the defendants' intentional and malicious conduct in converting those assets.

### COUNT V - BREACH OF FIDUCIARY DUTIES

37. Jim has breached his fiduciary duties to the Trust and to Bob, both of which have suffered direct and consequential damages as a result of those breaches. Jim is liable to Institute and Bob for all such damages. Punitive damages should also be imposed

against Jim for intentionally and maliciously breaching his fiduciary duties.

38.   Edwards, Eaton, Phoenix, and Kampen have breached their respective fiduciary duties to the Trust, which has suffered direct and consequential damages as a result of those breaches.   Each of these defendants is liable to Institute for all such damages. Punitive damages should be imposed against each of these defendants for intentionally and maliciously breaching their respective fiduciary duties.


## COUNT V - BREACH OF CONTRACT

39.   Jim has breached his contractual duties to the Trust and to Bob, both of which have suffered direct and consequential damages as a result of those breaches.   Jim is liable to Institute and Bob for all such damages.   Institute and Bob are entitled to recover their attorney fees and expenses from Jim.

40.   Edwards, Eaton, Phoenix, and Kampen each have contracted with the Trust with respect to the investments of the Trust held by these defendants, and each have breached their respective contractual duties to the Trust, which has suffered direct and consequential damages as a result of those breaches.   Each of these defendants is liable to Institute for all such damages. Institute is entitled to recover its attorney fees and expenses from these defendants, jointly and severally.

## COUNT VI – NEGLIGENCE, GROSS NEGLIGENCE AND INTENTIONAL CONDUCT

41.   Viewed in the most charitable light, defendants' actions described above were negligent and proximately caused damage to the Trust.   The supposed rationale for  the demands by Carla, Dennis, Edwards and the institutional defendants for documentation

was their acknowledged duties to verify the authority of the persons purporting to be the rightful trustee of the Trust.  These defendants owed these duties to the Trust and its beneficiaries not to injure them by accepting or acting on the instructions of anyone except the legitimate trustee, or by refusing to act on the instructions of the legitimate trustee, yet these defendants failed to exercise even a modicum of reasonable care in discharging their duties and knew, or reasonably should have known, that their failure to exercise reasonable care would injure the Trust and its beneficiaries.  Jim also owed a duty of reasonable care not to injure the Trust and its beneficiaries, yet Jim's actions described above demonstrate that Jim also failed to exercise even a modicum of reasonable care in discharging his duties and knew, or reasonably should have known, that his failure to exercise reasonable care would injure the Trust and its beneficiaries.  Plaintiffs (including Institute on behalf of the Trust and Bob as assignee of the beneficiaries' claims) have suffered direct and consequential damages as a proximate result of defendants' negligence, gross negligence and intentional conduct, and are entitled to recover from defendants [except for Melissa], jointly and severally, all such damages.  Also, because the defendants acted with gross negligence and intentional disregard for the harm that they knew or reasonably should have known would result from their conduct, plaintiffs are entitled to recover punitive damages from each of the defendants  [except for Melissa].

COUNT VII – TORTIOUS INTERFERENCE WITH CONTRACT

42.    By his actions described above, Jim has tortiously interfered with the contractual relationships between the Trust, its trustees and Edwards, and between the Trust, its trustees and each of the institutional defendants, causing breaches of each of those contractual relationships and thereby causing the Trust to suffer direct and

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **Page 20**

consequential damages.  Jim is liable to Institute, as the current trustee of the Trust, for all such damages.  Punitive damages should also be imposed against Jim for intentionally and maliciously interfering with these contractual relationships.

## CLASS ACTION ALLEGATIONS

### PREFACE

43.  Institute seeks certification of plaintiff classes under Rule 42 (b) (2) of the Tex. R. Civ. P. [or under its counterpart F.R.C.P. 23 (b) (2) in the unlikely event that this case is not remanded to state court], and seeks final injunctive and declaratory relief on behalf of such classes.  Institute does NOT seek damage awards on behalf of the class members. Because no claims of the putative class members could conceivably be foreclosed by this action, the proposed classes should be mandatory rather than "opt out" classes, and thus no notice prior to certification will be necessary.

44.  The allegations of paragraph 30 above are reasserted here.  The common core of corporate greed and subterfuge described in that paragraph underlies conduct by Edwards and the institutional defendants that is generally applicable to the putative classes, thereby making final injunctive and declaratory relief appropriate with respect to the classes.  Without such relief, the members of the putative classes will suffer irreparable harm.  On information and belief, each of the plaintiff classes is so numerous that joinder of all putative class members as individual parties herein would be impractical.

45.  Plaintiffs' counsel [Bob] is very experienced in the litigation of class actions and can fairly and adequately represent the proposed classes.

### CLASS A

46.  Institute seeks certification of a class of plaintiffs consisting of all customers of

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                    **Page 21**

Edwards who have requested within the past four years that Edwards change its records to reflect a new responsible party or person authorized to act with respect to the account and from whom Edwards has requested documentation other than, or in addition to, a statement of the change by the new responsible party or person authorized to act with respect to the account with a Medallion signature guarantee.

## CLASS B

47.  Institute seeks certification of a class of plaintiffs consisting of all customers of Eaton who have requested within the past four years that Eaton change its records to reflect a new responsible party or person authorized to act with respect to the account and from whom Eaton has requested documentation other than, or in addition to, a statement of the change by the new responsible party or person authorized to act with respect to the account with a Medallion signature guarantee.

## CLASS C

48.  Institute seeks certification of a class of plaintiffs consisting of all customers of Phoenix who have requested within the past four years that Phoenix change its records to reflect a new responsible party or person authorized to act with respect to the account and from whom Phoenix has requested documentation other than, or in addition to, a statement of the change by the new responsible party or person authorized to act with respect to the account with a Medallion signature guarantee.

## CLASS D

49.  Institute seeks certification of a class of plaintiffs consisting of all customers of Kampen who have requested within the past four years that Kampen change its records to reflect a new responsible party or person authorized to act with respect to the account and

from whom Kampen has requested documentation other than, or in addition to, a statement of the change by the new responsible party or person authorized to act with respect to the account with a Medallion signature guarantee.

## CLASS DECLARATORY RELIEF

50.  Institute seeks a declaration on behalf of each of the four classes as follows:

A.    That a demand by the defendant for unnecessary documentation as a precondition to changing its records to reflect a new responsible party or person authorized to act with respect to the account constitutes a breach of that defendant's contractual and fiduciary duties owed to the class members.

B.   That it is unnecessary and unreasonable for the defendant to demand anything other than, or in addition to, a statement of the change by the new responsible party or person authorized to act with respect to the account, with a Medallion signature guarantee, as a precondition to changing its records to reflect a new responsible party or person authorized to act with respect to the account.

## CLASS INJUNCTIVE RELIEF

51.  Institute seeks a permanent injunction on behalf of each of the four classes against Edwards, Eaton, Phoenix and Kampen as follows:

A.  Requiring each defendant to send a notice to each of its present account holders, and to each person and entity who has been an account holder within the past four years, informing them of the existence and contents of the declaratory judgment rendered in favor of the classes herein and of the possibility that they may have a claim for damages against the defendant if they have been the victim of an unreasonable or unnecessary demand for documentation.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                    **Page 23**

B.    Requiring each defendant to send a notice to each member of the class pertaining to that defendant, informing them of the existence and contents of the declaratory judgment rendered in favor of the classes herein, stating that the defendant's liability to that class member has been decided in favor of the class member, and explaining how the class member can bring suit against that defendant for damages.

C.    Prohibiting each defendant, under penalty of criminal contempt, from demanding unreasonable or unnecessary documentation as a pre-condition to changing the holder of record of accounts or to liquidating and delivering to the current owner of the account, promptly and without unnecessary delay, at the owner's request, the assets held in the account.

## JURY DEMAND

52.  Plaintiffs request a trial by jury on all claims in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for class certifications and for judgment against defendants as follows:

1. Declaratory judgments as set forth above;

2. Injunctive relief as set forth above;

3. Judgment for direct and consequential damages;

4. Judgment for punitive damages;

5. Judgment for attorney's fees and expenses, both with respect to the individual claims and with respect to the class claims;

6. Costs, pre-judgment and post-judgment interest, and all other relief to which plaintiffs may show themselves to be justly entitled.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                     **Page 24**

Respectfully submitted,


By:    /s/ Robert J. Fuller    
     Robert J. Fuller
     TBA No. 07523980
     8587 Southwestern Blvd # 2429
     Dallas, Texas 75206
     (972) 834-0852

ATTORNEY FOR PLAINTIFFS


CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2006, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  The electronic case files system sent a "Notice of Electronic Filing" to the lead counsel of record for each of the defendants, who are listed on the electronic service list below, each of whom has consented in writing to accept this Notice as service of this document by electronic means.

      /s/ Robert J. Fuller    
     Robert J. Fuller

Electronic Service List:

Brian W. Clark; bclark@krcl.com

Greg W. Curry; greg.curry@tklaw.com

Michael D. Napoli; mnapoli@klng.com

Ellen B. Sessions; ESessions@jenkens.com

Mike Stenglein; mstenglein@deweyballantine.com


**PLAINTIFF'S FIRST AMENDED COMPLAINT**          **Page 25**